IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------X
                                               :
RICK GOMEZ                            :          3:11 CV 1934 (JBA)
                                               :
V.                                                   :
                                             :
THE METROPOLITAN DISTRICT       :          DATE: JUNE 10, 2013
                                             :
---------------------------------------------------------X

## RULING ON DISCOVERY ISSUES

On December 15, 2011, plaintiff commenced this employment discrimination lawsuit against defendant The Metropolitan District ["defendant" or "MDC"], followed by his Amended Complaint, filed March 27, 2012 (Dkt. #11) and Second Amended Complaint, filed May 21, 2102 (Dkt. #28), regarding his employment at defendant MDC from October 19, 2001 through October 7, 2011 as a diversity officer.[1]  (Second Amended Complaint, ¶¶ 4-6, 11-12).   Plaintiff, who is an African-American male, alleges that he was subjected to racial discrimination in a variety of ways, including being excluded permanently from involvement in changes to defendant's Affirmative Action plans, being repeatedly ignored in hiring and promotion decisions, being denied promotions himself, being treated unfairly when he was assaulted by a larger, white male MDC employee, being subject to retaliation when he filed complaints with CHRO and EEOC, being subjected to verbal insults by his supervisor at two meetings, having his work transferred to an outside consultant (who was a white or Hispanic female), and then being terminated, allegedly for "lack of work" along with fifteen other MDC employees, six of whom also had complained about defendant's allegedly discriminatory employment practices. (Id. ¶¶ 13-46).   Plaintiff's Amended Complaint contains five counts:

---

[1]The original Complaint (Dkt. #1) also included defendants Robert Moore and Michael Jefferson, who were plaintiff's supervisors.

violation of Title VII, 42 U.S.C. § 2000e et seq. (Count One); violation of 42 U.S.C. § 1981 (Count Two); retaliation in violation of Title VII (Count Three); discrimination in violation of the Connecticut Fair Employment Practices Act ["CFEPA"], CONN. GEN. STAT. § 46a-60(a)(1) et seq. (Count Four); and retaliation in violation of CFEPA, CONN. GEN. STAT. § 46a-60(a)(4) et seq. (Count Five).  Defendant filed its Answer and Defenses on June 18, 2012.  (Dkt. #30).

On May 6, 2013, U.S. District Judge Janet Bond Arterton referred this file to this Magistrate Judge for all discovery.  (Dkt. #47; see also Dkts. ##38-42).  On May 3, 2013, plaintiff's counsel had sent a letter to Judge Arterton ["Plaintiff's 5/3/13 Letter"][2], which outlined two outstanding discovery disputes.[3]  Seventeen days later, on May 20, 2013, defense counsel forwarded a letter to this Magistrate Judge ["Defendant's 5/20/13 Letter"][4], addressing these same two issues.  In accordance with the telephonic discovery conference held before this Magistrate Judge on May 21, 2013 (see Dkts. ##48-49), on May 31, 2013, defense counsel forwarded an Ex Parte Letter to this Magistrate Judge ["Defendant's 5/31/13 Letter"].[5]

---

[2]The following exhibits were attached: copies of Overview Organization Assignment for Julie E. McLaughlin (Exhs. 1a & 1b); excerpts from the deposition of Robert Zaik, taken on February 12, 2013 (Exh. 2); copy of correspondence between counsel, dated February 14, 2013 (Exh. 3); copy of Defendant's Objections to Plaintiff's Second Set of Requests for Production, dated April 3, 2013 (Exh. 4); copy of e-mail correspondence between counsel, dated April 5, 12 and 17, 2013 (Exh. 5); copies of Amended Privilege Logs, dated March 20, April 9, and April 26, 2013 (Exhs. 6a-6C); copy of Summary of In Camera Review Requests & Privilege Challenges (Exh. 7); and excerpts from deposition of Russell Mannila, taken on April 8, 2013 (Exh. 8).

[3]Counsel were able to resolve one discovery issue on their own.

[4]In addition to copies of two published decisions, the following two exhibits were attached: excerpts from the deposition of Erin Ryan, taken on April 19, 2013 (Exh. A); and excerpts from the Mannila Deposition (Exh. B)

[5]Attached was a copy of Summary of In Camera Review Requests & Privilege Challenges (Exh. A); excerpts from the Ryan Deposition (Exh. B); excerpts from the Mannila Deposition (Exh.

I.  REQUESTS FOR PRODUCTION REGARDING INTERIM APPOINTMENTS

Plaintiff's Requests for Production Nos. 8 and 10 seek forms, memoranda, applications, letters, announcements, e-mails, and other documents regarding "non-union personnel filling any positions on an interim basis at any time from January 1, 2007 through December 31, 2011[,]" to which defendant has objected on a variety of grounds, including overbreadth, burdensomeness and irrelevance.  (Plaintiff's 5/3/13 Letter at 3-5 & Exhs. 4-5).  According to plaintiff, plaintiff "is aware of allegations by other employees that . . . defendant has a practice of filling open non-union positions with White employees on an interim basis, and then appointing that individual to fill the position on a permanent basis, so as to disadvantage African[-]American employees who apply for the permanent opening."  (Id. at 3).  Plaintiff alleges that he was a victim of this "suspected 'pattern and practice'" in late 2011 when he was denied a promotion to Special Services Administrator, a position held by a white woman on an interim basis who was given the permanent assignment; according to plaintiff, defendant's witnesses have acknowledged that African-American employees have made such allegations, but they deny that such practice exists.  (Id. at 3-4).  Plaintiff has offered to shorten the time period from January 1, 2009 through December 31, 2011, and requests merely a listing of any non-union personnel positions that were filled on an interim basis, the name of the employee who filled such position, the date the interim appointment was made, the non-union personnel positions that were initially filled on an interim basis but

---

C); copy of April 26, 2013 Second Supplemental Privilege Log (Exh. D); excepts from the Zaik Deposition (Exh. E); and copies of the twenty-one documents for in camera review.

If an objection is filed to this ruling, then Plaintiff's 5/3/13 Letter (with exhibits) and Defendant's 5/20/13 Letter (with exhibits) will be filed on CM/ECF, and Defendant's 5/31/13 Letter (with exhibits) will be filed **under seal**.   If no objection is filed, however, then copies of the twenty-one documents will be returned to defense counsel.

then filled on a permanent basis, the name of the employee who was selected to fill such position on a permanent basis, and the date the position was filled on that permanent basis. (Id. at 4-5 & Exh. 5).

Defendant argues in opposition that plaintiff has not alleged that he was adversely affected by a purported pattern and practice of discrimination and/or retaliation concerning the interim appointment procedure, and even if he did, such an allegation "does not open the door to allow him carte blanche discovery on any unrelated policy, practice or procedure allegedly employed by [MDC] in the course of its business." (5/20/13 Letter at 1-2). In addition, defendant asserts that district courts in the Second Circuit "repeatedly" have held that an individual plaintiff cannot maintain a private, non-class pattern or practice claim. (Id. at 2, citing Tucker v. Gonzalez, No. 03 CIV 3106 (LTS)(FM), 2005 WL 2385844, at *4 (S.D.N.Y. Sept. 27, 2005) and Foster-Bey v. Henderson, 3:98 CV 1097 (EBB), 2000 WL 620331, at * 1, n.1 (D. Conn. Apr. 7, 2000)).

Defendant is correct that "[w]hile neither the [U.S.] Supreme Court nor the Second Circuit have specifically addressed the question of whether an individual plaintiff can maintain a private, non-class action pattern or practice claim, district courts within this circuit have suggested that they cannot." Garrett v. Mazza, No. 97 Civ. 9148 (BSJ), 2010 WL 653489, at *11, n. 8 (S.D.N.Y. Feb. 22, 2010)(multiple citations omitted, including Tucker); McManamon v. City of New York Dept. of Corrections, No. 07 Civ. 10575 (BSJ)(JCF), 2009 WL 2972633, at *5, n.3 (S.D.N.Y. Sept. 16, 2009)(same); U.S. v. City of New York, 631 F. Supp. 2d 419, 425-26, 427 (S.D.N.Y. 2009)(same); Rambarran v. Mt. Sinai Hosp., No. 06 Civ. 5109(DF), 2008 WL 850478, at 8-9 (S.D.N.Y. Mar. 28, 2008)(same). See also Foster-Bey, 2000 WL 620331, at *1, n.1 ("The Court is not convinced that a plaintiff may bring a 'pattern

and practice claim' in a non-class complaint."); see also Rubinow v. Boehringer Ingelheim Pharms., Inc., No. 3:08 CV 1697 (VLB), 2010 WL 1882320, at *3 (D. Conn. May 10, 2010)(multiple citations omitted, including Foster-Bey).

Thus, based upon all these decisions in this District and in the Southern District of New York, it would appear that plaintiff cannot maintain a "pattern and practice" employment claim outside of a class action and therefore this discovery is irrelevant.

## II.  IN CAMERA REVIEW OF DOCUMENTS FOR WHICH A PRIVILEGE HAS BEEN ASSERTED

Both sides agreed that this Magistrate Judge should review the twenty-one documents as to which defendant has asserted the attorney-client privilege.  As explained by plaintiff, in January 2011, Erin Ryan was hired as Assistant District Counsel, Labor Relations, for defendant MDC; six months later, in July 2011, she was assigned to serve simultaneously as Interim Human Resource Director, which initially was going to be a temporary assignment while the permanent HR Director was on a medical leave of absence, but the Director never returned to her position.  (Plaintiff's 5/3/13 Letter at 5).  The parties agree that Ryan served in this dual role until June 2012, when Ryan became the permanent HR Director.  (Id.).

Plaintiff has placed the twenty-one documents into two categories, the first of which covers Nos. 1, 2, 3 and 20, concerning the staff reductions in October 2011 that resulted in the elimination of plaintiff's position and his termination; Ryan was one of six people – including Robert Zaik, Scott Jellison, John Zinzarella, R. Bartley Halloran (District Counsel), and Christopher Stone (Assistant District Counsel) – who met periodically during September-early October 2011 to determine which positions would be eliminated.  (Id. at 5-6).  Plaintiff suggests that "[a] review of the[se] documents could readily reveal that . . . Ryan's

involvement and communications about the staff reductions were conducted in her capacity as a primary decision-maker or as Interim H.R. Director, not as legal counsel. . . ." (Id. at 6). Plaintiff thus asks that all non-privileged documents, or portions of documents, be produced for plaintiff's counsel and that depositions be reopened "for the very limited purpose of questioning on such documents." (Id. at 6).

The second category of documents, which covers Nos. 4-19 and 21, all concern plaintiff's application to the Special Services Administrator position in October 2011; again plaintiff argues that Ryan "actively participated in the interview process, as well as the selection and approval of the final candidate" in her capacity as HR Director, in which she supervised the HR Officer, Russ Mannila. (Id. at 6-7 & Exh. 8). Plaintiff further asserts that Attorney Halloran's presence at the November 7-8, 2011 interviews "does not render all communications regarding or following those interviews privileged." (Id. at 7-8 & Exh. 8). Plaintiff similarly seeks production of all non-privileged documents, or portions of documents. (Id. at 8).

In its letter, defendant argues that plaintiff had ample opportunity to depose Ryan about these matters and has mis-characterized her testimony, that the attorney-client privilege "is not destroyed simply because an in-house attorney performs a dual function[,]" that Ryan testified that the reduction-in-force ["RIF"] efforts were assigned to her because she was Assistant District Counsel, that two other in-house attorneys (District Counsel Bart Halloran and Assistant District Counsel Chris Stone) "were also an integral part of the meetings that are memorialized in the notes[,]" that "there is also no legitimate basis" for disclosure of documents exchanged between Ryan and the outside consultant hired by defendant MDC, and that plaintiff has misconstrued the deposition testimony of Russ Mannila. (Defendant's 5/20/13 Letter at 2-5 & Exhs. A-B, citing Maxwell v. FOI Comm'n,

6

260 Conn. 143, 149 (2002) & Upjohn Co. v. U.S., 449 U.S. 383, 384 (1981)).

As U.S. Magistrate Judge James C. Francis explained in MSF Holding, Ltd. v. Fiduciary Trust Co. Int'l, No. 03 CV 1818 (PKL)(JCF), 2005 WL 3338510 (S.D.N.Y. Dec. 7, 2005):

> In-house counsel often fulfill the dual role of legal advisor and business consultant.  Accordingly, to determine whether counsel's advice is privileged, we look to whether the attorney's performance depends principally on [her] knowledge of or application of legal requirements or principles, rather than [her] expertise in matters of commercial practice.

At *1 (quotations & citations omitted).  In that case, Judge Francis held that the e-mails written by defendant's Senior Vice President/Deputy Corporate Counsel were not privileged, in that the author "never alluded to a legal principle in the documents nor engaged in legal analysis[,]" but rather "she collected facts just as any business executive would do in determining whether to pay an obligation[,]" so that "[i]n doing so, she evidently relied on her knowledge of commercial practice rather than her expertise in the law."  Id.  U.S. Magistrate Judge Frank Maas similarly observed that "because in-house counsel often serve dual roles as legal advisors and business consultants[,]" "[c]ommunications that principally involve the performance of non-legal functions by an attorney are not protected.  Moreover, even if a business decision can be viewed as both business and legal evaluations, the business aspects of the decision are not protected simply because legal considerations are also involved." Complex Sys., Inc. v. ABN Amro Bank N.V., 279 F.R.D. 140, 150 (S.D.N.Y. 2011)(quotations & citations omitted).   Thus, e-mails that "report purely factual matter[s]" could not be withheld on the basis of attorney-client privilege.  Id.  See also Ovensen v. Mitsubishi Heavy Inds. of America, Inc., No. 04 Civ. 2849 (JGK)(FM), 2009 WL 195853, at *2-4 (S.D.N.Y. Jan. 23, 2009)(same conclusion reached with respect to memoranda drafted by defendant's vice-president/general counsel to defendant's safety review committee to reduce accident rate, where only one paragraph contained legal advice, which paragraph

could be redacted).

This issue has been addressed in a number of decisions with respect to RIF documents either created by, or created at the direction of, a corporate defendant's attorneys. For example, in Hurst v. F.W. Woolworth Co., No. 95 Civ. 6584 (CSH), 1997 WL 61051 (S.D.N.Y. Feb. 11, 1997) & 1997 WL 104965 (S.D.N.Y. Mar. 7, 1997), defendant's Vice-President for Human Resources, who was actively involved in implementing the RIF at issue, had prepared three documents at the request of corporate counsel, including a Master Employment List, which he used "as a check sheet to make sure I had everybody in a spot either in or out." 1997 WL 61051, at *2 & 1997 WL 104965, at *2. This Vice-President had presented his RIF plan to corporate counsel for their review to ensure that he had acted appropriately. 1997 WL 61051, at *3 & 1997 WL 104965, at *2. Senior U.S. District Judge Charles Haight, Jr. held that the Vice-President had prepared the RIF plan "for business reasons, and later sought to have it reviewed by counsel[,]" and that "[t]his later review [did] not convert business documents into privileged communications." 1997 WL 104965, at *2.

In Freiermuth v. PPG Indus., Inc., 218 F.R.D. 694 (N.D. Ala. 2003), defendant's equal employment manager had prepared multiple "Reduction in Force Worksheets," with detailed information regarding the seven employees who were being considered for job elimination, to be reviewed by counsel. Id. at 696. Among the reasons for determining that these documents were not privileged was the fact that the attorney-client privilege:

> does not protect the disclosure of the underlying facts by those who communicated with the attorney. Courts have noted that a party cannot conceal a fact merely by revealing it to his lawyer. The completed work-sheet is a mere compilation of facts supporting a reduction in workforce decision that was ultimately reviewed by legal counsel. While a memorandum analyzing the legal risk of the proposed reduction in force would be privileged, the facts provided to counsel which support a business decision to

engaged in a workforce reduction are not protected.

Id. at 699-700 (multiple citations omitted).

A similar conclusion was reached in Suboh v. Bellsouth Bus. Sys., Inc., No. 1:03 CV 996 (CC)(CCH), 2004 WL 5550100 (N.D. Ga. Nov. 17, 2004), where defendant's Director of Human Resources had conducted a statistical analysis of the age and gender of individuals who had been discharged as part of the RIF at issue in the litigation, which statistical analysis had been done at the direction of defendant's Chief Labor and Employment Counsel in order to determine the impact of the RIF; defense counsel did not permit the HR Director to be examined about this analysis at her deposition. At *6-7.  Bearing in mind that "[t]he protection of the [attorney-client] privilege extends only to communications and not to facts[,]" the Magistrate Judge held that the HR Director could not "refuse to answer questions regarding the age, gender or race of [defendant's] workforce, before and after the RIF in questions, and the age, gender, or race of [its] employees discharged as party of that RIF[,]" but she could "refuse to answer . . . any questions related only to . . . confidential communications between the [in-house counsel] and herself, including what specific information she was asked to compile for the report, how that information was to be organized in the report, or any other communication that might reveal the thought processes of counsel for [d]efendant."  Id. at *8.  Likewise, the report itself was protected from disclosure under the attorney-client privilege, but

> the Court reiterates its conclusion that the data underlying the statistical analysis is not protected from disclosure by the attorney-client privilege. . . . Thus, [the HR Director] may not refuse to answer questions regarding any data related to [defendant's] employees and those . . . employees discharged as a result of the RIF simply because that data may have been part (or all) of a statistical analysis prepared for counsel.  She may, however, refuse to answer any questions regarding communications between [the in-house counsel] and herself, including what specific information she was asked to compile for the report, how that information was organized in the report, or

what conclusions she or [the in-house counsel] may have reached and communicated to each other regarding the information contained in the report.

Id. at *9 (citation omitted).

This issue was addressed exhaustively last year in Craig v. Rite Aid Corp., No. 4:08 CV 2317, 2012 WL 426275 (M.D. Pa. Feb. 9, 2012), modification with respect to some documents upon submission of supplemental affidavits, 2012 WL 1079472 (M.D. Pa. Mar. 30, 2012), where a senior in-house counsel was assigned "to the corporate team that was charged with evaluating and assessing the existing store structure[,]" "for the purposes of a large scale reduction in force and changes to manager positions and store structure." Id. at *8, 9.  This corporate team had fifteen members, including two in-house counsel. Id. at *13.  Not surprisingly, given the size of the defendant, myriads of documents were created, many by defendant's Vice President of Field Human Relations.  Id. at *3, 9-22.  The Magistrate Judge held that the documents that addressed legal issues or were the combined product of business information and legal advice were privileged, id. at *9-13, 23, whereas the investigatory, fact-gathering documents, including ones that sought review and feedback to the proposed store structure changes, wage information, budgeting issues, and operations issues, exchanged internally between members of this corporate team and with others inside Rite Aid, were not privileged.  Id. at *13-23.

A more stringent view, however, was taken in Williams v. Sprint/United Management Co., 238 F.R.D. 633 (D. Kan. 2006),[6] with respect to sixty-five documents that were "generally . . . spreadsheets reflecting various statistical analyses comparing the demographic data (gender, race and age) of employees targeted for layoff in the RIF at issue in this case

---

[6]This discovery ruling is but one of forty-eight decisions published in the Williams lawsuit, many of which concern discovery.

to the demographic data of those employees defendant intended to retain in the RIF." Id. at 636 & n.1.  These spreadsheets had been prepared pursuant to a memorandum from one of defendant's in-house attorneys to other attorneys in defendant's legal department and certain employees in the human resources department.  Id. at 637, 639.  As in all these cases, the critical issue was whether these documents "constituted mere compilations of underlying data generated and utilized by employees in defendant's human resources department (as asserted by plaintiffs) or whether the documents constituted statistical analyses undertaken at the direction of defendant's counsel (as asserted by defendant)." Id. at 636 & n.1.  After a two-day evidentiary hearing and an extensive in camera review, the Magistrate Judge concluded that "the adverse impact documents constituted communications made for the purpose of obtaining legal advice and at the direction of counsel[,]" with which the district judge agreed upon appeal.  Id. at 637, 640.   The Court held that it was of no moment that these documents at first "were exchanged exclusively among HR personnel," before being transmitted to defendant's counsel.  Id. at 638-40 & n.4.[7]

A case directly on point is Leazure v. Apria Healthcare Inc., No. 1:09 CV 224, 2010 WL 3895727 (E.D. Tenn. Sept. 30, 2010), where a corporate in-house attorney played a significant role in the decision-making process that led to plaintiff's termination. Id. at *1. The Magistrate Judge held that "[d]ocuments created for an ordinary business purpose by an attorney functioning as a business advisor" are not privileged.  Id. at * 4.  In reaching his conclusion, the Magistrate Judge had to resolve "the always difficult and uncomfortable question of the 'hat' in-house counsel wears." Id.  The in camera review revealed that RIF

---

[7]The Magistrate Judge and District Judge did not need to address whether the data summarized was discoverable, as they both found that plaintiffs had waived that argument. Id. at 643-44.

documents addressed plaintiff as the employee to be terminated, the timing of his termination, the reasons for his selection, and how other employees' disciplinary actions should be approached; the Magistrate Judge concluded that "[t]hese types of considerations are part of the normal process of determining who is to be terminated in a RIF and when and how to [be] carrying out a RIF; they are normal HR functions." Id.  Based upon these documents, the Magistrate Judge thus held that the in-house attorney's "role was that of a business advisor and an active participant and decision-maker in the decision to terminate plaintiff[,]" so that she was "not acting as a legal advisor in relation to the RIF and . . . the documents at issue reflect ordinary business purposes when making a decision to terminate employment in a RIF. . . ." Id.  As a result, the attorney-client privilege did not apply to these documents.  Id.

With these decisions in mind, a careful in camera review leads to the conclusion that despite defendant's arguments to the contrary (Defendant's 5/20/13 Letter at 2-3, 4-5; 5/31/13 Letter at 3-5), Document Nos. 3-15 and 20-21 are "[d]ocuments created for an ordinary business purpose by an attorney functioning as a business advisor" and thus are not privileged. Leazure, 2010 WL 3895727 at *4.  For these RIF documents or hiring documents, in which Ryan and/or Halloran are the author, or sole recipient, or one of several recipients, these two attorneys held the "role . . . of a business advisor and an active participant and decision-maker in the decision to terminate plaintiff" or not rehire him, so that they were "not acting as a legal advisor in relation to the RIF and . . . the documents at issue reflect ordinary business purposes when making a decision to terminate employment in a RIF. . . ." Id.  The content of virtually all of these documents is simply administrative in nature; only three contain any degree of analysis at all (Nos. 7, 15, 21). As in MSF Holding, 2005 WL 338510, at *1, these written communications contain no "knowledge of or application of legal

requirements or principles, rather than expertise in matters of [employment] practice[,]" the documents "never alluded to a legal principle in the documents nor engaged in legal analysis[,]" but instead just "collected facts just as any business executive would do in determining whether to [fire or hire an employee,]" so that "[i]n doing so, [they] evidently relied on [their] knowledge of [employment] practice rather than [their] expertise in the law." Id. Therefore, copies of these documents should be produced for plaintiff.

Five of the documents – Nos. 2, 16-19 – regard defendant's communications with Rita Kelley, who was an outside Equal Employment Opportunity consultant retained by defendant to provide recommendations regarding the October 2011 RIF and hiring. (Defendant's 5/20/13 Letter at 4; 5/31/13 Letter at 2-3). Defendant is correct that "[w]hen an expert is retained as a litigation consultant, . . . materials reviewed or generated by the expert are privileged and immune from disclosure." Employees Committed for Justice v. Eastman Kodak Co., 251 F.R.D. 101, 104 (W.D.N.Y. 2008).[8] Document No. 2 confirms that this was the purpose for which Kelley was retained by defendant,[9] and as a result Documents Nos. 2 and 16-19 are privileged and need not be disclosed.

Document No. 1 contains thirty-three pages of mainly handwritten notes of Ryan, for "panel discussion[s]" and "meeting[s]" held between September 6 and October 5, 2011. As in the decisions discussed above, many of the entries are simply fact finding, while some appear to contain some degree of analysis.

---

[8]This case also addresses what happens when a litigation consultant later morphs into a testifying expert, hence wearing "two hats[.]" Id. at 104-05. In the event that Kelley later becomes a testifying expert, plaintiff is free to seek reconsideration of this ruling.

[9]Kelley's e-mail address on Document No. 18 suggests that she was not an outside consultant (compare Documents Nos. 3-7, 11, 16, 20-21), but the Magistrate Judge will rely on defense counsel's representation that she was an "outside" consultant and not an employee of defendant.

Thus, for the five pages of minutes on September 6, 2011, defendant shall produce copies of the first page, second page (except for the three-line question on the right side), and third page, but need not produce the fourth and fifth pages;

defendant need not produce the two pages of minutes on September 23, 2011;

defendant need not produce the two pages of minutes on September 27, 2011;

defendant need not produce the two pages of typed and handwritten minutes on September 29, 2011;

defendant shall produce the three pages of minutes on October 5, 2011;

defendant shall produce the three pages of computer data;

defendant need not produce the one page of minutes on September 29, 2011;

defendant need not produce the five pages of minutes on September 30, 2011; and

defendant shall produce the ten pages of minutes on October 4, 2011.

### III.  CONCLUSION

Accordingly, for the reasons stated above, defendant shall disclose Document Nos. 3-15 and 20-21, and a redacted version of Document No. 1 to plaintiff as discussed above,[10] but need not produce Docs. 2 and 16-19 or requests regarding interim appointments.

Because this ruling is subject to review, see 28 U.S.C. § 636(b)**(written objections to ruling must be filed within fourteen calendar days after service of same);** FED. R. CIV. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut, as previously stated, these documents will remain in the Magistrate Judge's Chambers; if no objection is filed, they will

---

[10]If no objection to this ruling is filed, then defendant shall provide copies of these documents to plaintiff **on or before July 8, 2013**.

thereafter be returned to defense counsel.[11]

This is not a Recommended Ruling but a Ruling on discovery, the standard of review of which is specified in 28 U.S.C. § 636; FED. R. CIV. P. 6(a), 6(e) & 72; and Rule 72.2 of the Local Rules for United States Magistrate Judges.  As such, it is an order of the Court unless reversed or modified by the District Judge upon timely made objection.  See also Small v. Secretary, H&HS, 892 F.2d. 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit);** Caidor v. Onondaga County, 517 F.3d 601, 603-05 (2d Cir. 2008)(failure to file timely objection to Magistrate Judge's discovery ruling will preclude further appeal to Second Circuit).

Dated at New Haven, Connecticut, this 10th day of June, 2013.

   /s/ Joan G. Margolis, USMJ  
Joan Glazer Margolis  
United States Magistrate Judge

---

[11] See note 5 supra.