UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICK GOMEZ,
  *Plaintiff*,
   *v.*
METROPOLITAN DISTRICT,
  *Defendant*.

Civil No. 3:11cv1934 (JBA)

March 27, 2014

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Rick Gomez, is an African-American male and former employee of Defendant the Metropolitan District (the "District").  His Third Amended Complaint [Doc. # 60] alleges that he was terminated and subsequently not hired for a different position at the District due to discrimination on the basis of race and as a result of retaliation for complaints that he filed opposing discrimination.  Plaintiff asserts claims for (1) Discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* (Count One), 42 U.S.C. § 1981 (Count Two), and the Connection Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-51(10) & 46a-60 (Count Four); and (2) Retaliation in violation of § 1983 (Count Two), Title VII (Count Three), and the CFEPA (Count Five).

Defendant now moves [Doc. # 63] for summary judgment on all counts.  For the reasons that follow, Defendant's motion is granted in part and denied in part.

I.  **Facts**

A.  **Plaintiff's Employment**

The District is a non-profit, quasi-municipal corporation created by the Connecticut legislature in 1929, which provides water and wastewater treatment services and products to eight member towns and other residential and commercial customers.

(Zaik Aff., Ex. F to Def.'s Loc. R. 56(a)1 Stmt. [Doc. # 65] ¶¶ 5–6.)  Plaintiff, Rick Gomez was employed by the District from October 2001 through October 7, 2011.  For the first five years of his employment, Gomez held the position of Affirmative Action Officer, although at some point his title was changed to Diversity Officer.  (Gomez Dep. Tr., Ex. 1 to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 81] at 33–34.)   As the Affirmative Action/Diversity Officer, Gomez reported directly to the District's CEO, Charles Sheehan, and was responsible for reviewing all hires and promotions for racial neutrality and for conducting investigations of employee complaints.  (*Id.* at 33.)

At some point in 2006, Gomez had a conflict with management over the District's affirmative action plan, and thereafter he felt that management intentionally isolated him and excluded him from hiring and promotional decisions.  (Gomez Aff., Ex. 6 to Pl.'s 56(a)2 Stmt. ¶ 3.)   In November 2006, Gomez was involuntarily transferred to the Program Management Unit ("PMU") as the Diversity Officer and reported to personnel within Human Resources rather than the District's CEO.  (Gomez Dep. Tr. at 34–36.) Gomez's direct supervisor was Michael Jefferson, Diversity Manager for PMU, Jefferson reported to George Scurlock, Director of Diversity, who in turn reported to Erin Ryan, who was an Assistant District Counsel (and also served as interim Director of Human Resources).  (Zaik Dep. Tr., Ex. 7 to Pl.'s 56(a)2 Stmt. at 15–17.)

Gomez protested this transfer and expressed his view that he was being set up for failure.  (Gomez Aff. ¶ 5.)  In his new position, Gomez was no longer responsible for investigating internal complaints and his main responsibility became monitoring the District's outside contractors by conducting field site visits to observe and gather information about the percentage of minority workers in their workforce.  (Gomez Dep.

Tr. at 36–37.)   Gomez also worked to develop new compliance tracking processes, procedures, and programs, and worked on the District's summer student youth outreach program and community outreach regarding the District's water valve program.  (Gomez Aff. ¶¶ 6–7.)

During the final two years of his employment, Gomez increasingly felt targeted and subjected to harassment and disparate treatment by District management on account of his race.  (Gomez Aff. ¶ 9.)  In January 2010, Gomez was suspended for two days after an altercation with a coworker in the Information Technology Department, Mark Bednarz.  Bednarz had been instructed to retrieve Gomez's work-issued laptop computer so that it could be replaced with a desktop.  Shortly after Gomez was informed of the change, Bednarz appeared at his desk and demanded the computer without giving Gomez the opportunity to remove some personal materials first.  When Gomez declined to immediately hand over the laptop, Bednarz "grabbed" Gomez and "wrestled" the laptop out of his hands.  (Gomez Dep. Tr. at 57–58.)  Because Gomez believed that he had been the "victim of an assault," he went to the hospital emergency room and was treated with an ice pack, bandage, and a sling for strain.  (*Id.* at 83.)  Gomez and Bednarz both filed internal complaints regarding the incident, and the District conducted an investigation. (*Id.* at 77.)  Gomez was told that his actions were in violation of "basic professional behavior" and issued a two-day suspension, while Bednarz—who Gomez believed was the aggressor—received a one-day suspension.  (*Id.* at 91, 93–94.)

In June 2010, Gomez filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), alleging race-based disparate treatment largely based on the laptop incident.  (*See* CHRO Complaint, Ex. 2 to Pl.'s 56(a)2 Stmt.)

3

Gomez filed amended complaints with the CHRO, in December 2010 and March 2011, alleging that despite his role as Diversity Officer he was being excluded from hiring decisions, and was denied a promotion to Director of Diversity, on account of his race. (*See* Dec. 22, 2010 & Mar. 22, 2011 CHRO Am. Compls., Exs. 3–4 to Pl.'s 56(a)2 Stmt.) Gomez also filed an internal complaint with the District in March 2011, alleging that he was subject to ongoing and increasingly hostile and retaliatory treatment from his direct supervisor, Jefferson. (Gomez Dep. Tr. at 192–194.)

The CHRO scheduled a mediation and fact-finding conference for July 28, 2011. Gomez brought several witnesses with him to the CHRO proceeding, including his co-workers Lebert Thomas and Deborah Smith, to testify in support of his complaint. (Gomez Dep. Tr. at 109–110, 25–26, 128–129; *see also* Zaik Dep. Tr. at 75–76; Smith Aff., Ex. 10 to Pl.'s 56(a)2 Stmt. ¶ 8; Thomas Aff., Ex. 46 to Pl.'s 56(a)2 Stmt. ¶ 10.) Mediation was not successful and the parties did not proceed with the fact-finding conference. Robert Zaik, Manager of Labor Relations, attended the proceeding on behalf of the District, and Gomez believes Zaik was aware that Thomas and Smith had come to the CHRO proceeding to testify in his support. (Gomez Dep. Tr. 128–29; Zaik Dep. Tr. at 75–76.)

On September 15, 2011, Gomez requested a release of jurisdiction from the CHRO so that he could pursue his claims in court. (Gomez Aff. ¶ 23.) Within the next three weeks, Gomez's job responsibilities were first curtailed and he was then notified of his termination. In approximately the last week of September, the District's legal counsel, Bart Halloran, decided to reassign Gomez's responsibility for conducting site visits to collect data on the District's contractors to an outside consultant, Lilian Ruiz, who is a

white or Hispanic female. (Gomez Dep. Tr. at 194–95; Gomez Aff. ¶ 10.) Gomez was not directly informed of this decision and first learned of it when other inspectors at the sites reported that Ruiz and one of the District's attorneys, Carl Nasto, had already conducted inspections and said that Ruiz would be taking Gomez's duties. (Gomez Dep. Tr. at 194.) Scurlock, the Director of Diversity, initially told Gomez that he did not know anything about this change, but a few days later, he called Gomez and reported that Halloran had decided to make the change, and Gomez would now be able to focus more on doing "real Diversity work." (Gomez Aff. ¶ 11.)

Defendant contends that in 2010 through 2011, a number of community groups started to distrust the District's contractor diversity statistics, which were collected by Gomez. There were regular demonstrations by these groups in protest outside of the District's headquarters. (Zaik Aff. ¶ 15.) Personnel within the District were concerned that Gomez recorded contractor diversity data without personally verifying the information by conducting field visits (Zaik Aff. ¶ 16), and that the District would potentially lose government financing because no site visits had been conducted over the winter of 2010/2011 (Ryan Dep. Tr., Ex. 8 to Pl.'s 56(a)2 Stmt. at 48).

In order to combat this perception, the District hired Ruiz to provide an independent audit of Gomez's work, and eventually she assumed his responsibilities.[1] (Zaik Aff. ¶¶ 17–18.) Gomez acknowledged that there were concerns raised by District commissioners regarding the reliability of the District's contractor diversity data, but

---

[1] Plaintiff disputes that Ruiz conducted an audit of his work, because the District did not produce any documents in discovery indicating that Ruiz had done so. (Gomez Aff. ¶¶ 13–15.)

contended that hiring an outside consultant would not redress such concerns because they stemmed from the "compliance tracking mechanism" rather than the manual task of collecting data.  (Gomez Dep. Tr. at 195.)

### B.    Plaintiff's Termination

On October 7, 2011, approximately one week after having his job responsibilities curtailed, Gomez was notified that his job had been eliminated and his employment with the District was being terminated because the Connecticut Resource Recovery Authority ("CRRA") had decided to not review a twenty-six year contract under which it paid the District $2.1 million annually for management and labor costs for the Mid-Connecticut Project, a waste-to-energy project that provided electricity to the CRRA's member towns. (Zaik Aff. ¶¶ 7–8.)

Over three meetings in September and October 2011, a group of management and Human Resources personnel sought to determine how the District would cope with the loss of the $2.1 million.  (Zaik Dep. Tr. at 101.)  The District concluded that it would need to conduct a reduction in force ("RIF") in order to meet this shortfall, and the first positions selected for elimination were those that were directly responsible for working on the eliminated project.  (Zaik Aff. ¶¶ 24–26; Zaik Dep. Tr. at 106–07.)  Only three employees—Louise Guarnaccia, Lisa Remsen and Abdul Rabah—fell into this category and their termination did not come close to compensating for the $2.1 million shortfall. (Zaik Dep. Tr. at 60, 106–108; Jellison Dep. Tr., Ex. 12 to Pl.'s 56(a)2 Stmt. at 72.)  The District thus had to identify additional positions for elimination.

The group next sought to identify positions that provided administrative support for the project, such as those in Human Resources or technology (Zaik Dep. Tr. at 107–

10; Jellison Dep. Tr. at 70), and then additional positions throughout the District that could be eliminated without impacting its core mission to provide sewer and waters services.  (Zaik Dep. Tr. at 107–110; Jellison Dep. Tr. at 70, 65.)

Zaik, the Manager of Labor Relations; Scott Jellison, the Deputy CEO; and Ryan, acting as interim Director of Human Resources, identified positions within their respective departments that could be potentially eliminated.  John Zinzarella, Deputy CEO and CFO, provided projected cost savings from these eliminations, and Halloran, the District Counsel, and Christopher Stone, Assistant District Counsel, also participated to provide legal advice.  (Jellison Dep. Tr. at 62, 69, 92; Ryan Dep. Tr. at 35, 60; Zaik Dep. Tr. at 105–06, 111–14, 145–46.)

Jellison, Zaik, and Ryan contended that they only identified positions to eliminate and there was no discussion about the individuals holding such positions, although Jellison and Ryan acknowledged that they were aware that Gomez held the position of PMU Diversity Officer, which they considered eliminating.[2]  (Jellison Dep. Tr. at 69, 79; Zaik Dep. Tr. at 115; Ryan Dep. Tr. at 63–4.)

---

[2] On the day before oral argument on this motion, Plaintiff supplemented the record [Doc. # 93] with an email, dated July 20, 2011, from Sheehan to Zinzarella—both using their personal rather than business email accounts—in which Sheehan sent a list of 24 names.  The subject line read "As Discussed" and after the list of names, Sheehan wrote "Need Unit of Assignment, Salary, Years of Service and Union, if applicable (most if not all are E & E)."  At oral argument, Plaintiff contended that 18 of these employees were non-unionized and 14 of them—including Gomez, whose is identified as "R. Gomes" were ultimately terminated.  Plaintiff maintains that this email supports his theory of pre-selection and shows that the process for selecting positions for elimination started far earlier than Defendant has previously acknowledged.

In Ryan's notes from the meetings, she wrote the names of a number of the individuals who were to be eliminated, although she testified at her deposition that she did not believe that actual names were used during the meetings.  (*See* Erin Ryan Mtg. Notes, Ex. 14 to Pl.'s 56(a)2 Stmt.; Ryan Dep. Tr. at 127.)  For discussion during the meetings, Zaik prepared a number of draft lists of positions to be eliminated and the resulting potential cost savings.  On an undated draft of one such list in which Gomez was identified by name and position for elimination, Ryan added a handwritten notation below the chart in which she wrote Gomez's name and that of another employee, Donna Szestakow—who had also previously filed a complaint regarding discrimination—and connected the two with a bracket.  (Ryan Undated Notes, Ex. 15 to Pl.'s 56(a)2 Stmt.)  At her deposition, Ryan refused to answer questions regarding this notation on the basis of attorney-client privilege, but claimed that she did not recall Gomez and Szestakow being discussed during the meeting.  (Ryan Dep. Tr. at 155–58.)

Although Zaik testified that no positions within Gomez's Diversity Department were identified for elimination at either of the first two meetings (Zaik Dep. Tr. at 113), Ryan's wrote "Diversity-1" in her notes from the first meeting, indicating that one of the five positions in the department would be eliminated.  (Ryan Sept. 14, 2011 Notes, Ex. 14 to Pl.'s 56(a)2 Stmt. at 2.)  Ryan ultimately selected Gomez, Sharon Dixon, and Douglas Kerr for elimination, and explained that each of them was selected because the District "needed to recoup $2.1 million through x number of positions" and "the duties he was fulfilling could be fulfilled by others at The District."  (Ryan Dep. Tr. 39, 42–44.)  Ryan formed this belief as to Gomez, because his responsibility for site visits had already been

transferred to an outside consultant, and she was not aware of his other responsibilities. (*Id.* at 44.)

Ultimately, the group recommended a total of twenty positions for elimination. (Schedule of Positions Eliminated, Ex. H to Def.'s 56(a)1.)  On October 7, 2011, Gomez and the other affected employees were informed of their termination.  (Jellison Dep. Tr. at 57–8.)  On October 18, 2011, Gomez filed a second CHRO complaint, alleging that his termination was based on discriminatory animus and retaliation for his previous complaints.  (Gomez Dep. Tr. at 104–105; Ryan Dep. Tr. at 35; Oct. 18, 2011 CHRO Compl., Ex. 5 to Pl.'s 56(a)2 Stmt.)

### C.    Other Employees Affected by Defendant's Layoffs

In support of his claims for discriminatory and retaliatory discharge, Plaintiff has presented evidence regarding the other employees who were selected for layoffs.  Three of the twenty employees were unionized, and the cost of their salary was directly associated with the CRRA funding, another three were unionized employees not directly associated with the CRRA funding, and the remaining fourteen—including Gomez—were non-unionized salaried employees referred to as "exempt and excluded."  (*See* Schedule of Positions Eliminated.)

Of these fourteen non-unionized employees terminated, four or approximately 29% were African-Americans:  Plaintiff, Dixon, Smith, and Kerr.  (Zaik Dep. Tr. at 62–64.)  All but Smith were selected for elimination by Ryan, because she contended that their responsibilities could be fulfilled by other employees.  (Ryan Dep. Tr. at 37–39, 41–44, 52.)   African-Americans comprised approximately 16.5% of the District's overall workforce of non-unionized employees.  (Zaik Dep. Tr. at 85, P Ex. 20.)

Of the fourteen non-unionized employees, five or 36% had previously filed a discrimination complaint internally or with an outside agency. (Zaik Dep. Tr. at 96–97; List of Exempt and Excluded Nonunion Employees, Ex. 20 to Pl.'s 56(a)2 Stmt.) As of January 1, 2011, a total of six employees or just fewer than 6% of the District's workforce had previously complained of employment discrimination: Gomez, Szestakow, Smith, Dixon, Kathleen Drake, and Lebert Thomas. (List of Exempt and Excluded Nonunion Employees; Zaik Dep. Tr. at 85, 92–87.) Thomas was terminated in August 2011, and the other five were laid off in October 2011. (List of Exempt and Excluded Nonunion Employees; List of Eliminated Positions; Zaik Dep. Tr. 96–98.)

Szestakow, a Management Analyst employed by Defendant from November 1992 through October 2011, had filed a complaint with the CHRO in 2008 alleging disability discrimination and then filed that claim in federal court in 2010. This claim was pending at the time of her termination, and Zaik and Ryan—as well as Jellison, who selected her for termination—acknowledge that they were aware of Szestakow's complaints at the time of her termination. (Zaik Dep. Tr. at 46–48, 96, 114; Jellison Dep. Tr. at 46–48; Ryan Dep. Tr. at 35, 56, 82.)

Smith, an administrative assistant employed from March 1990 to October 2011, had filed a CHRO complaint in 2009, alleging racial discrimination regarding her salary. (Zaik Dep. Tr. at 83–84, Smith Aff. ¶ 13.) Smith also attended Gomez's July 2011 CHRO proceeding and was going to testify before it was canceled. (Smith Aff. ¶ 8, Gomez Dep. Tr. at 128–29; Zaik Dep. Tr. at 76, 83.) On August 11, 2011 Smith sent a letter to the District's board, copying Ryan, in which she voiced concerns regarding the District's failure to adhere to its own affirmative action plan and a hiring practice whereby

employees were appointed to positions in an interim capacity and later hired permanently for the position. (Smith Aff. ¶¶ 9–11 & Ex. 1 to Smith Aff.) Zaik, Ryan, and Sheehan were aware of these activities at the time of her termination in October 2011. (Zaik Dep. Tr. at 83–84, 96; Smith Aff. ¶¶ 9–13.)

Dixon, a Community Affairs Assistant employed from July 1987 until October 2011, had filed a CHRO and internal complaint in 2006, alleging racial discrimination on the basis of the District's failure to hire her for a position for which she had applied. (Zaik Dep. Tr. at 37–41.) Ryan, who selected her for termination, as well as Zaik, were aware of this complaint at the time she was selected for termination. (Zaik Dep. Tr. at 37, 96, 114; Ryan Dep. Tr. at 41, 43.)

Drake, a Staff Services Administrator employed from July 2008 until October 2011, filed an internal complaint in the fall of 2010 alleging that she had been subjected to a hostile work environment based on her gender. (Zaik Dep. Tr. at 44–45.) Both Zaik and Jellison (who selected her for termination) were aware of this complaint. (Zaik Dep. Tr. at 46, 97–97, 114; Jellison Dep. Tr. at 67, 74–78.)

### D.   Failure to Rehire Claim

Approximately one week before Gomez was terminated, he had applied for the position of Special Services Administrator. Although the position was filled on an interim basis by Julie McLaughlin, a white female who had never filed a discrimination complaint against the District, it was still considered vacant while the District used an "open competitive process" to fill it with an internal candidate. (Jellison Aff., Ex. G to Def.'s 56(a)1 ¶ 5; Ryan Dep. Tr. at 94.) Two employees included in the RIF applied to the position before their termination, Gomez and Szestakow.

After discussion between personnel in Human Resources, the District Counsel, and the District's CEO, Gomez and Szestakow were allowed to interview for the position even though they were no longer employed by the District.[3]  (Ryan Dep. Tr. at 80–81, 83–85.)  (Jellison Aff. ¶ 5.)  Mannila was assigned to handle recruitment for the position and conducted a pre-screening interview with each of the applicants, including Gomez on October 27, 2011 because Gomez's termination occurred before the listing's closing date. (Oct. 19 Email Mannila to Ryan, Ex. 33 to Pl.'s 56(a)2 Stmt.; Mannila Depo. Tr., Ex. 44 to Pl.'s 56(a)2 Stmt. at 6–7, 24, 35–37, 39–40, 66–67.)

In an email to Ryan, Mannila ranked the top nine candidates for the position with McLaughlin ranked first followed by Gomez.  Mannila described McLaughlin, Gomez, and another candidate as "very strong candidates" with "very good to excellent experience."  (Oct. 28, 2011 email Mannila to Ryan, Ex. 36 to Pl.'s 56(a)2 Stmt. at 1–2.) Ryan asked for additional information on how Mannila ranked the candidates and noted that they "needed to have lots of documentation as to why certain candidates are

---

[3] Szestakow did not actually interview for the position.  Defendant contends that she withdrew her application due to a scheduling conflict (*see* Jellison Aff. ¶ 7); Szestakow contends that she sent an email asking to reschedule her interview, but without explanation the District never again contacted her (Szestakow Aff., Ex. 39 to Pl.'s 56(a)2 Stmt. ¶¶ 4–10).  Defendant submitted the relevant email in which Russ Mannila, a Human Resources Officer, wrote that if she could not make her scheduled appointment "we will be unable to include you in the interview process."  (Reply [Doc. # 90] at 11 & Ex. F.)  Szestakow responded that she was traveling and could not make the interview and wrote "thank you for your consideration" without requesting an alternate interview date. Given this record, the Court need not accept Plaintiff's contention that Szestakow's affidavit creates a disputed fact.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

12

selected." She also suggested that during the interview process, the candidates be given a test, such as being required to draft a sample press release. (Oct. 28, 2011 email Ryan to Mannila, Ex. 37 to Pl.'s 56(a)2 Stmt.)

On November 7, 2011 when Gomez arrived at the District for his interview, he was met by District police officers, who patted him down for weapons, escorted him to the interview, and remained with him while he waited for his interview. (Gomez Dep. Tr. at 147, 151–54.)   After a 2010 shooting at Hartford Distributors in Manchester, Connecticut in which an employee killed eight of his co-workers after being asked to resign, the District had developed security protocols for former employees. (Jellison Aff. ¶ 20.) District police and other employees were also aware that Gomez had a permit for a concealed weapon. (Ryan Dep. Tr. at 95; Jellison Aff. ¶¶ 21–22.)

Gomez was the only former employee who was interviewed for the position and thus was the only candidate subject to this security screening. (Mannila Dep. Tr. at 95–97.) Jellison, who was ultimately responsible for hiring for the position, attended each of the interviews along with Mannila and Halloran. (Jellison Aff. ¶ 9; Jellison Dep. Tr. at 50–52.)   All of the applicants were given twenty minutes to complete a sample press release. (Jellison Aff. ¶ 12.) Gomez felt that during the interview his "frame of mind was not clear," because he was "extremely nervous" as a result of the security measures taken with him. (Gomez Dep. Tr. at 153–54.) Gomez was also unnerved by the presence of Halloran in the interview room and the fact that Halloran did not speak but just stared at him.

Gomez "wasn't happy" with the sample press release that he completed due to the "strenuous circumstances" under which he had to prepare it resulting from the initial

13

police presence, Halloran's presence and demeanor during his interview, and the fact that three District police officers watched him from a distance as he completed the assignment. (Gomez Dep. Tr. at 165.)

Mannila completed an interview evaluation for Gomez, and wrote that his sample press released contained "unacceptable typo's [*sic*]" and failed to incorporate some relevant information. (Supervisory Interview Report, Ex. N to Def.'s 56(a)1 at 3.) At his deposition, Gomez testified that he didn't "necessarily disagree" with this critique of his writing sample and acknowledged that his sample contained several grammatical errors, but contended that the critique did not account for the strenuous conditions of his interview. (Gomez Dep. Tr. at 166–67, 171.)

Jellison ultimately chose McLaughlin for the position, because she was judged to have performed well during the interview and produced the best sample press release. (Interview Notes for McLauglin, Ex. M to Def.'s 56(a)1; Jellison Dep. Tr. at 35; Jellison Aff. ¶ 13.)

II.     **Discussion**[4]

Plaintiff alleges that both his inclusion in the RIF and the District's failure to hire him for the position of the Special Services Administrator were the result of discriminatory animus and retaliation for his complaints with the CHRO regarding the "laptop incident," a March 2011 internal complaint regarding Jefferson, and his post-termination CHRO complaint.   The Court will first address Plaintiff's retaliatory discharge claim.

A.      **Retaliatory Discharge**

The burden-shifting framework laid out in *McDonnell Douglas* governs retaliation claims.[5]  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).  "In order to prove a claim of retaliation under Title VII, as well as Connecticut state law, a plaintiff must

---

[4] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record.  Fed. R. Civ. P. 56(c).

[5] "Although *McDonnell Douglas* concerned the burden and allocation of proof under Title VII, its framework is also applied to claims under 42 U.S.C. § 1981, and the CFEPA."  *Chukwurah v. Stop & Shop Supermarket Co. LLC*, 354 F. App'x 492, 494 n.1 (2d Cir. 2009) (internal citations omitted).

demonstrate that (1) she participated in a protected activity known to the defendant, (2) she suffered an adverse employment action, and (3) there exists a causal connection between the protected activity and the adverse employment action." *Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 680 (2d Cir. 2009) (internal citation to *Brittell v. Dep't of Corr.,* 247 Conn. 148 (1998)).

"Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Summa*, 708 F.3d at 125. (citing *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir. 2001)).  If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Id.* (internal quotation marks and alterations omitted).

Further, "a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision. However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive."[6] *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845–46 (2d Cir. 2013) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526, 2533 (2013)).

"A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.*

Plaintiff asserts that his October 7, 2011 termination was retaliation for his July 2010 CHRO complaint stemming from the "laptop incident" and an internal complaint that he filed in March 2011 alleging that Jefferson, his direct supervisor, had subjected him to ongoing hostile treatment. In support of this claim, Plaintiff notes that his job

---

[6] Although the Connecticut Supreme Court has not yet addressed whether the *Nassar* formulation of causation applies under the CFEPA, *see Consiglio v. Cigarette*, CV126027652S, 2014 WL 783471 (Conn. Super. Ct. Jan. 27, 2014), ("[O]ur Supreme Court has not yet adopted *Nassar's* narrow definition of the word 'because' and applied it to a claim brought under § 31–290a."), the Second Circuit has suggested that *Nassar* does not alter the district court's analysis at summary judgment, *see Zann Kwan*, 737 F.3d at 846 ("The determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact.").

responsibilities were eliminated just three weeks after the District learned that he sought a release of jurisdiction from the CHRO and was pursuing his complaint in court, and he was selected for termination shortly thereafter.  (Pl.'s Opp'n [Doc. # 82] at 41.)

A plaintiff's "presentation of a temporal connection" can be "enough, in and of itself . . . to permit a reasonable jury to find causation." *Summa v. Hofstra Univ.*, 708 F.3d 115, 127 (2d Cir. 2013).  However, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted).  There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," and a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Summa*, 708 F.3d at 128 (quoting *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2009). *Compare Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir. 1990) (finding a lack of evidence that an adverse action, taken three months after the plaintiff's EEOC complaint, was in response to the plaintiff's protected activity), *with Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45–46 (2d Cir. 1980) (finding that the lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection).

At oral argument, citing the Supreme Court's ruling in *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001), Defendant asserted that Plaintiff could not rely on his September 15, 2011 request for a release of jurisdiction from the CHRO three weeks

18

before his termination to support a showing of temporal proximity, because the relevant protected activity was his filing of the CHRO complaint in June 2010, not the routine step of obtaining a release of jurisdiction.  In *Breeden*, the plaintiff alleged retaliation based on her filing of a complaint in federal court and sought to show temporal proximity based on the fact that an involuntary transfer occurred ten days later.  *Id.* at 272.  The district court had concluded that because the defendant was not served with this complaint until one day after it contemplated the transfer, the plaintiff could not show any causal connection between the complaint and the transfer.  *Id.*  The court of appeals then reversed based on the fact that the EEOC had issued a right-to-sue letter to the plaintiff three months before the transfer, which provided the defendant with notice of her protected activity and thus established causation.  *Id.*  The Supreme Court reversed, concluding that there was no indication that the defendant knew about the right-to-sue letter at the time of the transfer, and "second, if one presumes she knew about it, one must also presume that she (or her predecessor) knew *almost two years earlier* about the protected action (filing of the EEOC complaint) that the letter supposedly disclosed."  *Id.* at 273.  The Supreme Court noted that the appeals court "did not adopt respondent's utterly implausible suggestion that the *EEOC's* issuance of a right-to-sue letter—an action in which the employee takes no part—is a protected activity of the employee."  *Id.*

Here, unlike in *Breeden*, Plaintiff does not rely upon his request for a release of jurisdiction from the CHRO to establish knowledge.  Instead, Plaintiff contends that this request constituted separate protected activity which indicated he was seeking enhanced remedies only available in state or federal court.  By contrast in *Breeden*, the Supreme

Court relied upon the fact that the plaintiff played no role in the issuance of the right-to-sue letter. *See id.*

Since *Breeden* was decided, the Second Circuit has held that the intermediate steps that a plaintiff actively pursues in support of a discrimination complaint—not just the filing of such charges themselves—are activities protected from retaliation. For example, in *Treglia v. Town of Manlius*, 313 F.3d 713, 720–21 (2d Cir. 2002), the Second Circuit rejected the argument that only the filing of an administrative complaint constituted a relevant temporal guide for a retaliation claim. The defendant argued that a causal connection could not be established because the allegedly retaliatory action occurred nearly one year after the plaintiff filed administrative charges of discrimination, but ignored "protected activity between those two dates." *Id.* One month before the adverse action, the New York State Division of Human Rights ("NYDHR") "requested that he submit a list of witnesses who could corroborate his charges of discrimination, after which he told several members of the department that they might be contacted as part of the NYDHR investigation." *Id.* at 721. The Second Circuit held that the temporal connection between this action in pursuit of his already-filed complaint and the retaliation shortly thereafter showed causation. *Id.*; *see also Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446–47 (2d Cir. 1999) (holding that one month gap between the service of deposition notices in the plaintiff's Title VII lawsuit and the employer's abusive acts was sufficient to establish a causal link). Accordingly, the temporal proximity between Gomez's request for a release of jurisdiction and his termination three weeks later is sufficiently close for a prima facie retaliation case.

While "temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, . . . without more, such temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).

Defendant contends that the loss of $2.1 million in funding is a legitimate non-discriminatory reason for Plaintiff's termination,[7] because eliminating the three positions directly associated with the Mid-Connecticut Project did not come close to making up for the $2.1 million shortfall and the District had to eliminate additional positions across the organization without impacting its core services.  (Def's Mem. Supp. [Doc. # 64] at 15–16.)  Defendant contends that Gomez's position fit this description, because the majority of his responsibilities—conducting site visits—had been transferred to an outside consultant.  (*Id.* at 17.)

Plaintiff claims not that the RIF itself was pretext, but rather that his inclusion in the RIF was based on discriminatory considerations.  *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995) ("A plaintiff who claims unlawful discrimination in the termination of employment may prevail notwithstanding the fact that his or her job was eliminated as part of a corporate reorganization or reduction in workforce, for 'even during a legitimate reorganization or workforce reduction, an employer may not dismiss employees for unlawful discriminatory reasons.'" (quoting *Maresco v. Evans Chemetics,*

---

[7] Although Plaintiff discusses numerous instances of alleged discrimination in the Third Amended Complaint and his opposition to Defendant's motion, the only adverse employment actions alleged and pursued in opposition to summary judgment are his termination and the failure to be hired as Special Services Administrator.

*Division of W.R. Grace & Co.,* 964 F.2d 106, 111 (2d Cir. 1992))).   Plaintiff argues therefore that the District's loss of funding is not itself a sufficient non-discriminatory justification for Gomez's termination, and it must justify the selection of Gomez. Defendant's proffered explanation is that Gomez's main responsibilities had been shifted to an outside consultant.

Plaintiff contends that there is sufficient evidence from which a jury could disbelieve Defendant's explanation.   (Pl.'s Opp'n at 29.)   First, Plaintiff notes that his position was not directly affected by the lost funding.   There is no dispute, however, that only three positions were directly funded by the CRRA contract and that the District had to consider other ways to function without it.   Next, Plaintiff contends that Ryan's explanations for selecting his position for elimination are contradictory, because at her deposition she testified that his position was eliminated because his responsibilities could be absorbed elsewhere in the District yet she "had no idea what Gomez's job duties actually were at the time she identified him for job elimination."   (Pl.'s Opp'n at 30.) While Ryan testified that she didn't "entirely know" Gomez's job responsibilities at the time of his termination, she also testified that he had been previously conducting site visits, but by the time of his termination was no longer doing so.   (Ryan Dep. Tr. at 44.) Given that site visits was Gomez's primary job responsibility and the elimination of this responsibility was Defendant's primary justification for eliminating his position, Ryan's testimony in this respect is not significantly contradictory or inconsistent.

Pressing on, Plaintiff argues that his responsibility for site visits was transferred to an outside consultant in late September 2011 at a time when Defendant was already considering positions to eliminate, and this transfer of responsibility became the primary

22

justification for his termination, demonstrating that he was personally targeted for elimination.  (*See* Pl.'s Opp'n at 27); *see also Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) ("[W]here, as here, the plaintiff claims not that her employer used poor business judgment in discharging her but that her employer used the structural reorganization as a cover for discriminatory action, a federal court, to ensure that the business decision was not discriminatory, is not forbidden to look behind the employer's claim that it merely exercised a business decision in good faith.").

Defendant's proffered non-discriminatory explanation for diminishing Gomez's responsibilities was concerns raised by outside groups "[i]n or around 2010 into 2011" over the reliability of the District's contractor diversity data.  (Zaik Aff. ¶ 15.)  Some of Gomez's superiors were concerned that Gomez was recording unreliable contractor diversity data without personally conducting site visits and verifying the data, as he was supposed to do.  (*Id.* ¶ 16; *see also* Ryan Dep. Tr. at 48.)  Zaik contends that Ruiz was hired to conduct an audit of Gomez's work and eventually was retained as an independent third-party source, which was intended to improve the perceived credibility of the District's data.  (Zaik Aff. ¶ 18; Zaik Dep. Tr. at 79.)

Gomez acknowledges that outside groups had raised concerns regarding the reliability of the contractor data, but contends that such concerns would not be redressed by changing the data collection methods as opposed to the "compliance tracking mechanism."  (Gomez Dep. Tr. at 195.)  Given the specific nature of Defendant's concerns—the adequacy of Gomez's performance of his responsibilities—his disagreement with the District's business decisions does not demonstrate pretext.  *See McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a

discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff.  We are interested in what 'motivated the employer,' the factual validity of the underlying imputation against the employee is not at issue." (quoting *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 716 (1983)) (internal citation omitted)).  However, as Plaintiff notes, the District never produced any evidence that Ruiz in fact performed the audit that it contends she was retained to conduct, casting doubt upon Defendant's explanation.

Plaintiff also cites inconsistencies in the record regarding the process that the District employed to select employees versus positions for elimination, as discussed *supra*.  (*See* Pl.'s Opp'n at 32.)  Drawing all favorable inferences for Plaintiff and assuming that specific individuals were discussed during the meetings and preselected for termination, as Plaintiff acknowledges, this showing alone is not sufficient to defeat summary judgment.  (*See* Pl.'s Opp'n at 32 (citing *Gaffney v. Dep't of Info. Tech. & Telecommunications*, 536 F. Supp. 2d 445, 465 (S.D.N.Y. 2008) ("Although the evidence Stewart has put forth would allow a rational juror to conclude that Defendants preselected particular Foundation Line Employees prior to conducting interviews, this consideration alone . . . does not demonstrate . . . that race or age discrimination were the real reasons behind Defendants' decision.")).)

Nevertheless, evidence of preselection would undermine Defendant's assertion that Gomez's termination was the result of a completely objective process that did not take into account his prior protected activity.  Additionally, while the significance of the belatedly discovered July 20, 2011 email from Sheehan to Zinzarella is not apparent, a jury could reasonably conclude that (1) it contradicts Defendant's description of the

24

selection process; (2) it evidences that the selection process occurred months earlier than Defendant acknowledged, and (3) the fact that Sheehan wrote to Zinzarella using both of their personal email accounts could suggest a motive to conceal the fact that the District was actually selecting specific employees rather than positions for elimination.   While such discrepancies do not prove on their own that Gomez's termination was retaliatory, such inconsistencies and contradictions could lead a reasonable jury to conclude that the explanation was not believable.  *See Zann Kwan*, 737 F.3d at 845–46.

Finally, Plaintiff contends that "the record is replete with circumstantial evidence of disparate treatment of employees who, like Gomez, engaged in protected conduct by complaining about discrimination."  (Pl.'s Opp'n at 41.)  Plaintiff relies upon admittedly small-sample statistical evidence showing that five[8] out of the fourteen (36%) non-union employees included in the RIF had previously filed a complaint or otherwise opposed discrimination (Pl.'s Opp'n at 41), which Defendant asserts is insufficient to support an inference of retaliatory motive under *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115 (2d Cir. 1997).   However, the only other exempt and excluded employee who had previously complained of discrimination was terminated in January 2011, and thus, after the October 2011 layoffs, all six of the non-union employees who had complained of discrimination were terminated.  (*Id.*)  At oral argument, Plaintiff contended that despite the small sample size this evidence was probative of retaliatory intent because: (1) the

---

[8] Defendant contends that one of these five employees, Deborah Smith, was not terminated, but rather chose to retire and accept a severance package after she was informed that her position had been selected for elimination. (Zaik Aff. ¶ 33.) Given that Smith was indisputably *selected* for termination, there is no significance to the fact that when faced with this certainty, she chose to retire.

correlation is 100%; (2) the employees' protected activity all occurred over a short period of time prior to the October 2011 RIF; and (3) their termination resulted from the same process with the same decision makers.

In *Pollis*, the plaintiff "based her case" on a statistical analysis of the application of a mandatory retirement provision to eight tenured professors over nearly a twenty-year period.  132 F.3d. at 120.  Statistical evidence showed that six male professors who reached the mandatory retirement age were allowed to retain full-time positions, while two females who reached the age were not.  The Second Circuit vacated a jury verdict in her favor and ruled that this "statistical evidence suffers from several serious flaws that render it insufficient to sustain a reasonable inference that her treatment by the [defendant] was motivated by discriminatory intent."  *Id.* at 121.  Three of the male professor reached the retirement age over twenty years prior to the plaintiff and were retained by a different university president and board of trustees, and the qualifications of each of the six male professors differed substantially from that of the plaintiff.  *Id.* at 121–22.  Additionally, "the size of the group subjected to statistical analysis was tiny—especially considering that the comparisons encompassed a twenty-year period."  *Id.* at 121.  The Second Circuit did not hold in *Pollis* that, as a matter of law, such a sample size could never be sufficient if other statistical shortcomings were not present and the inference sought to be drawn from the statistics was supported by other evidence.  *See id.* ("A statistical showing of discrimination rests on the inherent improbability that the institution's decisions would conform to the observed pattern unless intentional discrimination was present.  The smaller the sample, the greater the likelihood that an

observed pattern is attributable to other factors and accordingly the less persuasive the inference of discrimination to be drawn from it.").

By contrast in *Stratton v. Dep't for the Aging for City of New York*, 132 F.3d 869, 876 (2d Cir. 1997), the Second Circuit affirmed a jury verdict finding age discrimination where the plaintiff presented evidence that over a fourteen-month period after a new commissioner was appointed to a city agency, the average age of the highest ranking officials dropped from 50.3 to 45.9.  Given that this evidence was "only part of the overall proof" and "accompanied by substantial other evidence showing discrimination," the Second Circuit held that the district court properly admitted such evidence.[9]  *Id.* at 877.

---

[9] The rulings of the Second Circuit and district court do not specify the sample size.  The district court did, however, also admit evidence regarding the age of the eleven managers that the new commissioner personally hired or promoted.  Rejecting the defendants' post-trial arguments that "eleven employment decisions are too small a statistical sample to be meaningful," the court noted that the "[d]efendants overlook the fact that the eleven employment decisions here do not constitute a 'sample,' but the entire universe of managers hired or promoted by [the commissioner].  These decisions, made by a single person over only a four year period, were thus properly admitted as circumstantial evidence of improper motive."  *Stratton*, 922 F. Supp. 857, 864 n.5 (S.D.N.Y. 1996).

The Court concludes that the statistical evidence proffered by Plaintiff is relevant circumstantial evidence that could support the inference that Defendant used the RIF as an occasion to "clean house" of all employees who had previously engaged in protected activity.[10]  Consistent with *Stratton*, such statistical evidence is not sufficient on its own to support an inference of retaliatory motive, but with Plaintiff's other evidence—inconsistencies in Defendant's explanations about the reduction of Gomez's responsibilities and the process used to select him for elimination—Plaintiff has produced minimally sufficient evidence to support an inference of retaliatory motive.[11]

---

[10]  After oral argument, Defendant filed [Doc. #94] a Notice of Supplemental Authority, discussing two cases from outside this Circuit that it contends disproves Plaintiff's theory that a "sample size that it otherwise too small as a matter of law to be considered significant can nonetheless raise a genuine issue of material fact . . . if the plaintiff claims that the sample size contains all members of a protected class."  (*Id.* at 1–2.)  The Court has not concluded that but for the 100% correlation the sample size would be insufficient as a matter of law, and in both of the cases submitted by Defendant the sample size is smaller and the nature of the statistical evidence is fundamentally different because it speaks only to the percentage of protected workers *within* a given RIF, *see Anderson v. NVR, Inc.*, No. 09cv2294 (JFM), 2010 WL 5479637, at *7 (D. Md. Dec. 30, 2010) (where four employees applied for a promotion, and the two selected were both under 40-years-old and the two rejected were both over 40, the court concluded that "[s]uch a tiny pool of candidates results in a sample size that is simply too small to have any statistical significance"); *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 267 (6th Cir. 2010) (where two of three employees eliminated were over 50 and the single retained employee was 29, the Sixth Circuit concluded that "such a small statistical sample is not probative of discrimination"), while Plaintiff relies on the percentage of protected workers in the *entire workforce* who were selected for inclusion in the RIF. Only five out of the fourteen non-unionized employees *within* the RIF had engaged in protected activity (36%), but the more relevant statistic is that 100% of the employees *in the entire workforce* who had engaged in a protected activity were eliminated.  *Anderson* and *Schoonmaker* do not address this situation.

[11]  In its briefing (*see* Reply at 8 n.5) and at oral argument, Defendant suggests that this statistical evidence must be accompanied by expert testimony.  The Second Circuit

Accordingly, Defendant's motion for summary judgment on Plaintiff's retaliatory discharge claim in Counts Two, Three and Five is denied.

### B.    Discrimination in Termination

To meet the minimal burden of establishing a prima facie case of discrimination in the termination context, "a plaintiff must show that he (1) is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). If shown, "the burden shifts to the employer to articulate a legitimate, non–discriminatory reason for the employee's dismissal. If such a reason is proffered, the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The separate stages of a plaintiff's demonstration of a prima facie inference of discrimination and pretext "tend to collapse as a practical matter under the *McDonnell Douglas* framework." *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 n.1 (2d Cir. 2002).

In support of his discriminatory termination claim, Plaintiff offers a different statistical analysis—that four of the fourteen non-unionized employees terminated, or 29%, were African-American, while African-Americans comprised just 16.5% of the

---

rejected a similar argument in *Stratton*. *See* 132 F.3d at 877 ("[N]o expert was required. There was no 'gerrymandering' of statistics here. Rather, simple arithmetic was used— the ages of all the individuals were used to calculate an average age for each chart. There were no sophisticated statistical theories that needed explanation." (internal citations omitted)).

relevant workforce.  (Pl.'s Opp'n at 33.)  Plaintiff acknowledges, however, that this "figure may not be statistically significant in a technical sense," but contends that "it is noteworthy simply because it is significantly higher than the percentage of African Americans in the total Exempt and Excluded workforce." (*Id.*)  Unlike Plaintiff's evidence showing that 100% of those non-union employees who had engaged in protected activity were terminated in a short period of time, Plaintiff's evidence that 29% of those selected for the RIF were African-Americans, does not support an inference of discrimination.

While the strong correlation between protected activity and inclusion in the RIF was sufficient to support an inference that Defendant sought to "clean house" on the retaliatory discharge claim, these statistics are of a fundamentally different nature and do not support an inference of discrimination.  Plaintiff does not offer evidence that would support any such racially based "clean house" theory and offers no statistics to suggest that a substantial proportion of the District's African-American workers were included in the RIF.

Rather, these statistics demonstrate that African-Americans were overrepresented in the RIF vis-à-vis their numbers in the District, but a minority of those included in the RIF were African-American.  While, as discussed above, Plaintiff has offered evidence of pretext, absent any other evidence to support an inference of discriminatory motive, no reasonable jury could conclude that Defendant was terminated on account of his race. Accordingly, Defendant's motion for summary judgment is granted on Counts One and Four and the discriminatory discharge claim in Count Two.

### C.     Discrimination in Hiring

Gomez's failure to hire claim is also governed by the three-step burden shifting analysis of *McDonnell Douglas Corp.  See Ruszkowski v. Kaleida Health Sys.*, 422 F. App'x 58, 60 (2d Cir. 2011).  Defendant does not dispute Plaintiff's prima facie case on the failure to hire claim, but contends that it chose McLaughlin over him, because she performed better on both the interview and sample press release.  (Def.'s Mem. Supp. at 28–30.)  Plaintiff contends that "there is absolutely no evidence to support the claim that McLaughlin was 'the most qualified candidate.'"  (Pl.'s Opp'n at 34.)  But Defendant need not prove that McLaughlin was actually the more qualified candidate; it must only adduce proof that her selection was not based on discriminatory motive.  *See McPherson*, 457 F.3d at 216; *see also Brierly v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 296 (E.D.N.Y. 2005) ("The Defendants are not required to prove that Watkin–Fox was the superior candidate; they are only required to offer non-discriminatory explanations for how and why they chose her over Brierly.").

McLaughlin's superior performance during her interview satisfies the District's burden of providing a non-discriminatory reason for not hiring Gomez.  *See Lomotey v. Connecticut Dep't of Transp.*, 355 F. App'x 478, 482 (2d Cir. 2009).  Plaintiff contends that the interview methods used by the District were subjective, which evidences pretext. (Pl.'s Opp'n at 34.)  The Second Circuit has cautioned that "an employer may not use wholly subjective and unarticulated standards to judge employee performance." *Knight v. Nassau Cnty. Civil Serv. Comm'n,* 649 F.2d 157, 161 (2d Cir. 1981).  If subjective evaluations were not scrutinized, a defendant would likely always respond "with a claim of some subjective preference or prerogative" and consequently would likely always

prevail. *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1040 (2d Cir. 1979).  Employers can use subjective evaluations when making hiring decisions, but an employee is also allowed to challenge the evaluation's credibility.  *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) ("[A]lthough Cromwell is entitled to use subjective criteria in choosing whom to hire, Byrnie is also entitled to challenge the credibility of the decision's rationale.").  While Defendant's description of interview performance may be subjective, the sample press release provided an objective basis for comparing candidates and Gomez acknowledged that his submission was lacking.

   Plaintiff also contends that he was subjected to a "very different, and much more strenuous, application process than any other candidate faced" as a result of the police reception and presence outside of the interview room, and Halloran's unexpected presence in the interview room.  (Pl.'s Opp'n at 35.)  Although the police presence was understandably unnerving, Defendant provided a legitimate non-discriminatory justification for implementing a security policy generally applicable to former employees after the Hartford Distributors shooting.  Gomez was the only candidate subjected to this security procedure, but he was also the only external candidate interviewed, and thus the police presence does not support an inference that Gomez was denied a genuine opportunity to compete for the position or that McLaughlin was preselected.

   Notably, before the interview, McLaughlin and Gomez were ranked first and second, respectively, based on their qualifications for the position, and McLaughlin was ultimately hired after performing better than Gomez at the interview.   Gomez acknowledged that his writing sample contained several grammatical errors and did not dispute Defendant's assessment that such errors were "unacceptable" and that the sample

failed to incorporate some relevant information.  (*Id.* at 166–167, 171.)  McLaughlin's interview indicated that she was "[v]ery articulate in explaining her role and responsibilities," her sample press release "was excellent," she provided other examples of her outreach work for the District over the prior six years, and overall demonstrated "intimate knowledge" of the District given her work experience.  (McLaughlin Interview Evaluation, Ex. M to Def.'s 56(a)1 at 3.)  Jellison believed that she "was more refined and more articulate over all the candidates" and already had experience doing the job as a result of her interim appointment.  (Jellison Dep. Tr. at 35.)

Further, although Gomez was unnerved by the presence of the District's top lawyer at his interview, it is undisputed that Halloran was present for each of the interviews.  (Halloran Dep. Tr. at 52.)  There is no dispute that aside from the security presence at Gomez's interview, the interview process for all candidates was the same and each was asked to complete the same sample press release in the same amount of time. (Jellison Aff. ¶¶ 10–12.)

Finally, Plaintiff contends that McLaughlin's hiring was part of a "suspected pattern and practice at the District whereby Caucasian employees are appointed into open positions first on an interim basis, and then selected for the permanent position, to the disadvantage [of] African American employees."  (Pl.'s Opp'n at 37.)  Although the Court overruled Defendant's repeated objections to allowing Plaintiff to pursue discovery in support of this claim (*see* Substituted Ruling on Discovery Objs. [Doc. # 70] at 11–13; Ruling Denying Def.'s Mot. for Reconsideration [Doc. # 78] at 2–8), Plaintiff acknowledges that this pattern and practice is just "suspected" and that he has not

produced any evidence that he was a victim of it.[12]   (Gomez Dep. Tr. at 157.)   *Cf. Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 150 (2d Cir. 2012) ("Evidence of an employer's general practice of discrimination may be highly relevant to an individual disparate treatment or to a disparate impact claim.").   Plaintiff has not established that there is a triable issue of fact that the District's non-discriminatory reason for not hiring him was pretext.   *See Richane v. Fairport Cent. Sch. Dist.*, 179 F. Supp. 2d 81, 90 (W.D.N.Y. 2001) ("His poor performance at the interview was reason alone to select other candidates who performed better.").   Accordingly, Defendant's motion for summary judgment is granted with respect to the discriminatory hiring claims of Counts One, Two, and Four.

### D.        Retaliatory Failure to Hire

Plaintiff further alleges that Defendant refused to hire him as retaliation for his earlier administrative and CHRO complaints as well as the CHRO complaint that he filed on October 28, 2011, a week after his termination and before his interview for the Special Services Administrator position on November 22, 2011.[13]   (Gomez. Aff. ¶ 24.)

Although Defendant contends that Gomez cannot establish a prima facie case of retaliatory failure to hire because there is no evidence that Jellison—who made the hiring decision—was aware of his post-termination CHRO complaint, "for purposes of a prima

---

[12] After the Court ordered Defendant to produce data regarding its interim hiring practices, it revealed that there were eleven non-union positions filled on an interim basis from 2009 through 2011 by white employees.   Only four of the employees ultimately chosen to occupy these positions on a permanent basis were white.   (*See* Ex. 4 to Gomez Aff.; Ryan Dep. Tr. at 20, 90.)

[13] Plaintiff filed [Doc. # 1] this action on December 15, 2011, after his interview.

facie case, a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case."[14]  *Zann Kwan*, 737 F.3d at 844 (quoting *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000)).  While the temporal proximity between Gomez's CHRO complaint challenging his termination and Defendant's decision to not rehire him is sufficient to establish a prima facie case, as discussed above, it is not sufficient to demonstrate pretext.  *See El Sayed*, 627 F.3d at 933.

To establish pretext Plaintiff relies upon the same statistical evidence regarding the number of employees who had filed discrimination complaints and were later terminated that he offered in support of his retaliatory discharge claim, and the same evidence that he offered for pretext in support of his discriminatory failure to hire claim. In the termination context the statistical evidence could support an inference of retaliation, because it related to the adverse action challenged—Defendant's termination in a RIF that eliminated all remaining dissenters from the District.  Applying this same evidence to the failure to rehire claim does not support such an inference.[15]  Even if the evidence could demonstrate a general animus towards dissenters, there is no evidence to specifically connect this general animus to the relevant hiring decision and Plaintiff has

---

[14] At his deposition, Jellison denied that he was aware at the time of Plaintiff's interview of the post-termination CHRO complaint (Jellison Dep. Tr. at 44–45), but it was later revealed that Jellison received two emails on the same date that Plaintiff was interviewed for the Special Services Administrator position that mentioned Plaintiff's complaint (*see* Exs. 34, 43 to Pl.'s 56(a)2 Stmt.)  Jellison contends that he had not reviewed these emails prior to Plaintiff's interview, and had no recollection of having seen them until after his deposition.  (Jellison Aff. ¶ 17.)

[15] As discussed, *supra* at Note 3, the record does not support Plaintiff's contention that Szestakow, the only other former employee who had engaged in protected activity and applied for the position, was denied an opportunity to compete.

not otherwise rebutted Defendant's legitimate non-discriminatory justification for the failure to rehire him.   Accordingly, Defendant is granted summary judgment on Plaintiff's retaliatory failure to rehire claim in Counts Two, Three and Five.

## III.    Conclusion

For the reasons discussed above, Defendant's Motion [Doc. # 63] for Summary Judgment is GRANTED on Counts One and Four, the discriminatory discharge claim in Count Two, and the retaliatory failure to rehire claims in Counts Three and Five; and it is DENIED on the retaliatory discharge claims in Counts Two, Three and Five.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 27th day of March, 2014.